## ADAMS EXPRESS COMPANY *v.* OHIO STATE AUDITOR.[1]

APPEAL FROM THE COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 337. Argued December 10, 11, 1896. — Decided February 1, 1897.

The decision of the Supreme Court of Ohio entertaining jurisdiction of this case, and delivering a considered opinion, *State* v. *Jones,* 51 Ohio St.

---

[1] The docket title of this case is " Henry Sanford, President of the Adams Express Company, Appellant; *v.* Ebenezer W. Poe, Auditor of the State of Ohio, *et al.*" The opinion of the court is entitled in this case and in No. 338, Henry Sanford, President of the Adams Express Company, Appellant, *v.* Ebenezer W. Poe, Auditor of the State of Ohio, *et al.;* No. 339, James C. Fargo, President of the American Express Company, Appellant, *v.* Ebenezer W. Poe, Auditor, etc., *et al. ;* No. 340, Thomas C. Platt, President of the United States Express Company, Appellant, *v.* Ebenezer W. Poe, Auditor,

Syllabus.

492, adjudging the Nichols law to be valid under the constitution of that State, will not be reviewed by this court.

Although the transportation of the subjects of interstate commerce, or the receipts received therefrom, or the occupation or business of carrying it on, cannot be directly subjected to state taxation, yet property belonging to corporations or companies engaged in such commerce may be; and whatever the particular form of the exaction, if it is essentially only property taxation, it will not be considered as falling within the inhibition of the Constitution.

The property of corporations engaged in interstate commerce, situated in the several States through which their lines or business extends, may be valued as a unit for the purposes of taxation, taking into consideration the uses to which it is put and all the elements making up aggregate value; and a proportion of the whole fairly and properly ascertained may be taxed by the particular State, without violating any Federal restriction.

While there is an undoubted distinction between the property of railroad and telegraph companies and that of express companies, there is the same unity in the use of the entire property for the specific purposes, and there are the same elements of value, arising from such use.

The classification of express companies with railroad and telegraph companies, as subject to the unit rule, does not deny the equal protection of the laws; as that provision in the Fourteenth Amendment was not intended to prevent a State from adjusting its system of taxation in all proper and reasonable ways, and was not intended to compel a State to adopt an iron rule of equal taxation.

The statute of the State of Ohio of April 27, 1893, 90 Laws Ohio, 330, (amended May 10, 1894, 91 Laws Ohio, 220,) created a board of appraisers and assessors, and required each telegraph, telephone and express company doing business within the State to make returns of the number of shares of its capital, the par value and market value thereof, its entire real and personal property, and where located and the value thereof as assessed for taxation, its gross receipts for the year of business wherever done and of the business done in the State of Ohio, giving the receipts of each office in the State, and the whole length of the line of rail and water routes over which it did business within and without the State. It required the board of assessors to

etc., *et al.; Appeals from the United States Circuit Court of Appeals for the Sixth Circuit;* and in No. 398, Clarence A. Seward, Vice-President of the Adams Express Company, Appellant, *v.* Ebenezer W. Poe, Auditor of the State of Ohio; No. 399, James C. Fargo, President of the American Express Company, Appellant, *v.* Ebenezer W. Poe, Auditor of the State of Ohio; and No. 400, Thomas C. Platt, President of the United States Express Company, Appellant, *v.* Ebenezer W. Poe, Auditor of the State of Ohio; *Appeals from the Circuit Court of the United States for the Southern District of Ohio.*

"proceed to ascertain and assess the value of the property of said express, telegraph and telephone companies in Ohio, and in determining the value of the property of said companies in this State, to be taxed within the State and assessed as herein provided, said board shall be guided by the value of said property as determined by the value of the entire capital stock of said companies, and such other evidence and rules as will enable said board to arrive at the true value in money of the entire property of said companies within the State of Ohio, in the proportion which the same bears to the entire property of said companies, as determined by the value of the capital stock thereof; and the other evidence and rules as aforesaid." *Held,*

(1) That, assuming that the proportion of capital employed in each of the several States through which such a company conducts its operations has been fairly ascertained, while taxation thereon, or determined with reference thereto, may be said in some sense to fall on the business of the company, it does so only indirectly; and that the taxation is essentially a property tax, and, as such, not an interference with interstate commerce;

(2) That the property so taxed has its actual situs in the State and is, therefore, subject to its jurisdiction; and that the distribution among the several counties is a matter of regulation by the state legislature;

(3) That this was not taking of property without due process of law, either by reason of its assessment as within the jurisdiction of the taxing authorities, or of its classification as subject to the unit rule.

(4) That the valuation by the assessors cannot be overthrown simply by showing that it was otherwise than as determined by them.

THESE are cases involving the constitutionality of certain laws of the State of Ohio providing for the taxation of telegraph, telephone and express companies, and the validity of assessments of express companies thereunder.

The general assembly of Ohio passed, April 27, 1893, 90 Ohio Laws, 330, an act to amend and supplement §§ 2777, 2778, 2779 and 2780 of the Revised Statutes of that State (commonly styled "The Nichols Law"), which was amended May 10, 1894. The law created a state board of appraisers and assessors, consisting of the auditor of State, treasurer of State and attorney general, which was charged with the duty of assessing the property in Ohio of telegraph, telephone and express companies. By the act as amended, between the first and thirty-first days of May annually each telegraph, telephone and express company, doing business in Ohio, was

required to file a return with the auditor of State, setting forth among other things the number of shares of its capital stock; the par value and market value (or, if there be no market value, then the actual value) of its shares at the date of the return; a statement in detail of the entire real and personal property of said companies and where located, and the value thereof as assessed for taxation. Telegraph and telephone companies were required to return, also, the whole length of their lines, and the length of so much of their lines as is without and is within the State of Ohio, including the lines controlled and used, under lease or otherwise. Express companies were required to include in the return a statement of their entire gross receipts, from whatever source derived, for the year ending the first day of May, of business wherever done; and of the business done in the State of Ohio, giving the receipts of each office in the State; also the whole length of the lines of rail and water routes over which the companies did business, within and without the State. Provision was made in the law for the organization of the board, for the appointing of one of its members as secretary and the keeping of full minutes of its proceedings. The board was required to meet in the month of June and assess the value of the property of these companies in Ohio. The rule to be followed by the board in making the assessment was that " in determining the value of the property of said companies in this State, to be taxed within the State and assessed as herein provided, said board shall be guided by the value of said property as determined by the value of the entire capital stock of said companies, and such other evidence and rules as will enable said board to arrive at the true value in money of the entire property of said companies within the State of Ohio, in the proportion which the same bears to the entire property of said companies, as determined by the value of the capital stock thereof, and the other evidence and rules as aforesaid."

As to telegraph and telephone companies, the board was required to apportion the valuation among the several counties through which the lines ran, in the proportion that the length of the lines in the respective counties bore to the

entire length in the State; in the case of express companies, the apportionment was to be made among the several counties in which they did business, in the proportion that the gross receipts in each county bore to the gross receipts in the State.

The amount thus apportioned was to be certified to the county auditor, and placed by him on the duplicate "to be assessed, and the taxes thereon collected the same as taxes assessed and collected on other personal property," the rate of taxation to be the same as that on other property in the local taxing district.

The valuation of all the real estate of the companies, situated in Ohio, was required to be deducted from the total valuation, as fixed by the board.

Provisions were made for hearings and for the correction of erroneous and excessive valuations, as follows:

"At any time, after the meeting of the board on the first Monday in June, and before the assessment of the property of any company is determined, any company or person interested shall have the right, on written application, to appear before the board and be heard in the matter of the valuation of the property of any company for taxation. After the assessment of the property of any company for taxation by the board, and before the certification by the auditor of State of the apportioned valuation to the several counties, as provided in section 2780, the board may, on the application of any interested person or company, or on its own motion, correct the assessment or valuation of the property of any company, in such manner as will, in its judgment, make the valuation thereof just and equal. The provisions of section 167 of the Revised Statutes shall apply to the correction of any error or over-valuation in the assessment of property for taxation by the state board of appraisers and assessors, and to the remission of taxes and penalties illegally assessed thereon."

Section 167 of the Revised Statutes, referred to, reads thus:

"SECTION 167. He [the auditor of State] may remit such taxes and penalties thereon as he ascertains to have been illegally assessed, and such penalties as have accrued or may

accrue in consequence of the negligence or error of any officer required to do any duty relating to the assessment of property for taxation, or the levy or collection of taxes, and he may, from time to time, correct any error in any assessment of property for taxation or in the duplicate of taxes in any county; provided that when the amount to be remitted in any one case shall exceed one hundred dollars, he shall proceed to the office of the governor and take to his assistance the governor and attorney general, and in all such cases may remit no more than shall be agreed upon by a majority of the officers named."

Instead of distributing the valuation as under the act of 1893, the state board by the act of 1894 was to certify it to the auditor of State, whose duty it was made to apportion and certify the valuation among the counties.

In No. 337 the taxes for 1893 were involved; and in Nos. 338, 339 and 340, the taxes for 1894. These are appeals from the Circuit Court of Appeals for the Sixth Circuit. In Nos. 398, 399 and 400 the taxes for 1895 were involved. These are appeals from decrees of the Circuit Court for the Southern District of Ohio.

The original suits were brought in the Circuit Court to enjoin the certification of the apportioned valuations to the county auditors, as to 1893, against the state board; as to 1894 and 1895, against the auditor of State.

The Circuit Court, Taft, J., on April 23, 1894, after a preliminary opinion, filed opinions in the case of the *Western Union Telegraph Company* against the *State Board*, 61 Fed. Rep. 449, and in No. 337, *Adams Express Co.* v. *Poe*, 61 Fed. Rep. 470, holding the Nichols law to be invalid under the constitution of Ohio. On the first of May following the Supreme Court of Ohio decided that the Nichols law was constitutional and valid. *State* v. *Jones*, 51 Ohio St. 492.

Thereupon the Circuit Court reversed its ruling, and accepted the decision of the Supreme Court of the State, and Judge Taft filed a further opinion holding that the assessments were valid. 64 Fed. Rep. 9.

In all the cases the final decrees of the Circuit Court dis-

solved the temporary injunctions which had been granted, sustained demurrers and dismissed the bills.

The Circuit Court of Appeals affirmed the cases taken to it on appeal. 37 U. S. App. 378, 399 ; 69 Fed. Rep. 546, 557.

The proceedings of the state board in making the assessments for 1895 and certain correspondence are set forth in the records as if exhibits to the bills. The action of the board, relative to express companies, is thus given :

"The board having given each express company doing business in Ohio, whose property in Ohio is hereinafter assessed, opportunity to appear and be heard personally by the board, and having heard all companies which desired to be heard through their officers, agents or counsel, and having carefully considered the facts set out in the returns, schedules and supplementary statements of such companies and all evidences of value and all matters bearing upon the question of the value of the property of the companies which, in the judgment of the board, would assist it in arriving at the true value, in money, of the entire property of each of said companies within the State of Ohio, on motion, the state board of appraisers and assessors unanimously fix and determine the values of the property of express companies hereinafter named in Ohio to be taxed therein at the amounts set out in the following table:

> The Adams Express Company.......... $533,095.80
> The American Express Company....... 499,373.60
> The United States Express Company... 488,264.70 "

This valuation was made July 24, 1895. On the second of August, counsel for the companies wrote the auditor requesting to be advised of the assessments when made, in order that they might apply for a correction. On the seventh of August the secretary of the board informed counsel of the assessments. On August 10, counsel wrote asking " upon what calculation, if any, the apparently precise amounts of the assessments, especially in the case of express companies, are based and how the figures are arrived at."

The auditor replied for the board that " the method pursued

by the state board of appraisers and assessors this year in assessing the property in Ohio of the Western Union Telegraph Company and the express companies you represent is not different from that followed in former years, which has been sustained by the courts, and is set forth in the records of the board."

Attention was called to certain data lacking in the companies' returns, and counsel were informed that opportunity would be afforded for a hearing on September 2 at 10 o'clock A.M.; but the three bills involving these assessments were filed August 14, 1895. Subsequently returns were filed as of May 1, 1895, showing: As to the Adams Express Company. Number of shares: 120,000. Market value: $140 to $150. Taxable value of real estate owned in Ohio: $25,170. Value of personal property, including moneys and credits, owned by company in Ohio: $42,065. Total value of real estate owned outside of Ohio: $3,005,157.52. Total value of personal property owned outside of Ohio: $1,117,426.05. Entire gross receipts from whatever source received within the State for the year: $282,181. Whole length of lines of rail and water routes over which the company was doing business: 29,647 miles. Length without the State: 27,518 miles. Within the State: 2129 miles.

As to the United States Express Company. Number of shares: 100,000. Par value: $100. Market value: $40. Taxable value of real estate owned in Ohio: $22,190. Value of personal property, including moneys and credits, owned in Ohio: $28,438. Entire gross receipts from whatever source derived within the State: $358,519. Length of lines within the State over which the company was doing business: 3011 miles.

As to the American Express Company. Number of interests: 180,000. Par value: $100. Market value: $112. Taxable value of real estate in Ohio: $58,660. Value of personal property, including moneys and credits, in Ohio, $23,430. Total value real estate outside of Ohio: $4,891,259. Total value of personal property outside of Ohio: $1,661,759. Gross receipts within the State: $275,446. Whole length of lines: 35,295 miles. Length within the State: 1731 miles.

The companies made no return of their entire gross receipts of business wherever done, nor of the terms of their contracts or arrangements for transportation.

These returns stated and the bills repeated that aside from the real estate mentioned the companies had no property in the State of Ohio "except certain horses, wagons, harness, trucks, safes and office fixtures located at different points," and that their actual value was given. That "the business of the company in the State consists in carrying packages on passenger and express trains, steamboats and stages in the care and custody of its employés who accompany the packages. The express company has no ownership of nor interest in these means of conveyance, and simply pays to the railroad companies and the owners of the steamboats and stage coaches for the passage of messengers and their accompanying packages. The horses, wagons and trucks are used by it in the collection and delivery of these packages. There is no peculiarity about this property; it is of an ordinary kind, whose true value in money must be measured by the ordinary standards, and is easily ascertained and determined."

Each of the bills in Nos. 398, 399 and 400 alleged that the scheme of taxation contemplated by the act, "while professing to provide for taxation of property in the State of Ohio, does not, in fact, do so, inasmuch as it directs the state board of appraisers, in determining the value of the property of express companies in said State for the purpose of taxation, to be 'guided by the value of said property as determined by the value of the entire capital stock of said company . . . in the proportion which the same (viz., the property of the companies within the State) bears to the entire property of said companies, as determined by the value of the capital stock thereof'"; that "the value of the capital stock or shares of said company and of express companies generally is determined not so much by the value of the property and appliances which they use in carrying on their business, as by the skill, diligence, fidelity and success with which they conduct their business. Said company employs many thousands of men who are constantly engaged in carrying express pack-

ages, many of them of great value, from one part of the country to another, and its income and the value of its shares are largely the result of their efforts, fidelity and integrity and of skilful management and supervision of the business. Said company furthermore owns real and personal property of great value aside from the appliances of its express business, which is not held or taxable in the State of Ohio, and some of which is not taxable at all, all of which, however, together with the business connections of the company and the reputation and good will which it has earned in the course of more than fifty years of public service, enter largely into the value of its capital shares"; that the market price of the company's shares does not "afford any fair, reasonable or just method of estimating the value of its property or fixing the basis of value for the purpose of taxation, because the market price is speculative and variable, depending upon financial conditions not at all connected with this company, its business, or its property; and your orator insists that said scheme of taxation is unfair, illegal, unjust and unequal and is a regulation of and a tax upon interstate commerce and a taking of its property without due process of law"; that the act and the assessments made thereunder are in contravention of the Constitution of the United States because the act provides for the assessment of, and the assessments embrace, property not situated within the jurisdiction of the State of Ohio, and the property of the companies is, therefore, taken without due process of law; and that the scheme as a special one imposes an illegal burden on interstate commerce, and denies the equal protection of the laws.

*Mr. Lawrence Maxwell, Jr.*, for the express companies. (*Mr. Clarence A. Seward* for the Adams Express Company; *Mr. James C. Carter* for the American Express Company; and *Mr. Frank H. Platt* for the United States Express Company were on his brief.)

It has been decided by this court that express companies "have no tangible property, of any consequence, subject to

taxation under the general laws." *Pacific Express Co.* v. *Seibert*, 142 U. S. 339, 354.

Plaintiffs assign for error that the Circuit Court erred in sustaining the demurrers to the bills and in dismissing the bills, insisting especially that the assessments complained of are not in fact assessments against the plaintiffs in respect of their property held or owned by them in the State of Ohio, or within the taxing jurisdiction of that State, but that the assessments are really an attempt, under the guise of taxing the plaintiffs' property within the State, to enforce against them the payment of a tax upon their business, which is largely interstate commerce, or for the privilege of doing such business in the State of Ohio, by placing a fictitious and artificial value upon their property; and that the assessments, and the statute of Ohio purporting to authorize them, are therefore in contravention of the Constitution of the United States, especially the interstate commerce clause of Art. 1, Sec. 8, of Art. 4, Sec. 2 and of Art. 14, Sec. 1.

We do not concede that the assessments complained of in the bills are authorized by the Nichols law, or that the Supreme Court of Ohio would justify them if they were before that court. But the Circuit Court and the Circuit Court of Appeals held that the assessments complained of had been made in pursuance of a definite rule or principle of appraisement, recognized and established by the Nichols law, as construed by the Supreme Court of Ohio. Our argument, therefore, is addressed to the question whether that rule is valid under the Federal Constitution.

I. The cases raise a Federal question, viz., whether the rule of assessment prescribed by the Ohio statute, and adopted by the state board, for the taxation of express companies contravenes the Federal Constitution.

Taking the allegations of the bills in connection with the returns made by the express companies to the state board, and the transcript of the proceedings of the state board upon those returns, it is manifest that what the board did, and what the demurrers to the bills admit that they did, was not to assess the defendants on the basis of the market value of

such of their tangible property as was found within the State of Ohio, and on their moneys and credits in the State, but to treat the companies as owning dividend producing plants, whose value is represented by the market value of their shares, and to assign a portion of that value to the State of Ohio, as being property subject to taxation in that State. The basis of the apportionment made by the board to Ohio is not disclosed; it was evidently hap-hazard and arbitrary; but that is not material now. The point is that the state board deliberately and intentionally followed a certain rule and principle of assessment, being the rule prescribed by the statute of the State, as construed by its supreme court, and the validity of that rule is therefore raised by the record, and presents a Federal question.

II. If the Nichols law justifies the assessments complained of, it contravenes the interstate commerce clause of the Federal Constitution; because the assessments, while purporting to be upon the property of the plaintiffs within the State, are, in fact, levied upon the plaintiffs' business (which is largely interstate commerce), by placing a fictitious and artificial value upon their property.

Under the interstate commerce clause of the Federal Constitution it is not competent for a State to tax a non-resident person or corporation engaged in interstate commerce, upon their occupation or business. The State's power of taxation, in such cases, is limited to a tax upon such of the property of the person or corporation, as is found within the taxing jurisdiction of the State, and that property must be taxed without discrimination. It is just as much a violation of this rule of the Federal Constitution to levy a tax ostensibly on property, but really on business, by ascribing an artificial or fictitious value to the property, as to make the levy directly and in terms upon business.

III. The rule for the assessment of express companies, prescribed by the Nichols law, discriminates against the property of express, telegraph and telephone companies, on account of its mere ownership, as compared with all other property in the State, and therefore denies to those companies the equal

protection of the law, in contravention of the Fourteenth Amendment of the Federal Constitution.

I do not deny the power of the legislature to classify property. But the power to classify is not arbitrary. It must be classification in fact, and not discrimination. Property cannot be classified in respect to mere ownership. The same kind and character of property devoted to the same uses, within the same taxing districts, cannot be taxed by one rule against one class of persons and by a different rule against another class. But that is precisely what the Nichols law attempts to do.

The classification of railroad and telegraph property as unit property is not a classification according to ownership, but according to intrinsic differences in the character, use and situation of such property, and the difficulty attending the ascertainment of its value otherwise than as a unit. These considerations make the separate classification of such property not merely convenient, but necessary, as well as natural and reasonable. But the property owned by express companies within the State of Ohio is not different in its character, uses or situations from other similar property within the State, nor is there any greater difficulty in ascertaining its value for purposes of taxation.

IV. The Nichols law is in contravention of the Fourteenth Amendment, for the further reason that it taxes property not within the taxing jurisdiction of the State of Ohio.

It has been held more than once in this court that the power of a State to tax the property of nonresidents is limited to such of their property as is found within the State; in other words, that a State cannot tax lands lying beyond its borders, nor personal property domiciled in another State. *Hays* v. *Pacific Steamship Co.*, 17 How. 596, 599; *Railroad Co.* v. *Jackson*, 7 Wall. 262, 267, 268; *St. Louis* v. *Ferry Co.*, 11 Wall. 423, 430, 432; *Railroad Co.* v. *Pennsylvania*, 15 Wall. 300; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 206, 210.

The ground upon which this immunity is secured, under the Federal Constitution, has not been clearly stated in all the

cases. The earlier ones arose prior to the adoption of the Fourteenth Amendment, but we submit, that it is depriving a person of property without due process of law, in contravention of the Fourteenth Amendment, for a State to tax property not within its jurisdiction.

V. There is no necessary or proper relation between the value of the property of an express company and the value of its capital shares.

VI. If the rule of assessment, applied by the state board against the plaintiffs, contravenes the Federal Constitution, it is immaterial whether that rule is prescribed by the statute, or whether it is adopted, independent of the statute, by the board itself.

*Mr. Thomas McDougall* for appellees. *Mr. F. S. Monnett,* Attorney General of the State of Ohio, was on his brief.

I. The constitutionality of this law under the Ohio constitution is settled by the decision of the Ohio Supreme Court. *State ex rel.* v. *Jones, Auditor,* 51 Ohio St. 492.

II. The only question raised by appellants which is before this court is whether the law violates the Federal Constitution.

If the law violates the Federal Constitution, then the demurrers were erroneously sustained. If the law does not violate the Federal Constitution, then the only other question raised by the appellants is the difference of opinion between them and the board of appraisers as to the value of their property. The appellants are not entitled to have this court consider any question of difference of opinion as to the value of their property as assessed by the board for taxation merely by asserting that such action violates the Federal Constitution, unless it appears that the law under which the valuation was made does violate that Constitution. These cases are to be heard on demurrer, and if this court decides that the action complained of does not violate the Federal Constitution, it will thereby decide that the bills do not sufficiently allege such violation, that the facts set up in the bills do not show

such violation; in other words, that facts which would raise a Federal question are not alleged, and that there is no such Federal question in the cases.

III. The act does not deny to the appellants due process of law, nor equal protection of the laws.

The pleadings, together with the law itself, show the following facts with reference to this subject:

1. The law itself states the times of the sessions of the board. The returns made by the companies are the statements of their cases to the boards, and they may appear if they so desire to make oral statement. Upon application, any of the companies affected has the right to appear before the board prior to the determination of the assessment, to be heard on the question of the valuation of its property for taxation. It appears from the pleadings, as a matter of fact, that the companies were present, and were heard in the matter of the valuation of their property for taxation.

2. After the valuation of the property of any company for taxation, and before the certification by the auditor of State of the apportioned valuations to the several counties, the board may, upon the application of any interested person, or on its own motion, correct the assessment.

3. If the board refuses to correct the assessment regarded by the company as erroneous, it may appeal, under section 167, Revised Statutes of Ohio, to a board composed of the governor of the State, the auditor of State, and the attorney general.

4. By section 5848, Revised Statutes of Ohio, the illegal levy and collection of taxes may be enjoined; and further, if compelled to pay the tax, complainants may sue to recover it back.

It cannot be questioned that these provisions and remedies, under the decisions of this court, and of the Ohio Supreme Court, constitute due process and equal protection of the laws. State v. Jones, 51 Ohio St. 492; Davidson v. New Orleans, 96 U. S. 97; State Railroad Tax cases, 92 U. S. 575; McMillen v. Anderson, 95 U. S. 37; Kentucky Railroad Tax cases, 115 U. S. 321; Pittsburgh, Cincinnati &c. Railway v. Backus,

154 U. S. 421; *Pacific Express Co.* v. *Seibert,* 142 U. S. 339; *Missouri Railway Co.* v. *Mackey,* 127 U. S. 205.

IV. The law does not violate the Constitution of the United States by interfering with interstate commerce.

The law simply provides a method for the valuation of property for taxation, and the tax laid upon the valuation made is a tax on the property of the companies in Ohio, and is not a tax upon interstate commerce. The details of that method are all directed toward ascertaining the value in money of the property in Ohio. The tax imposed is not a license tax, nor a tax on a business or occupation, nor on transportation through the State, nor upon receipts from business done outside of Ohio, nor upon property outside of Ohio. The tax imposed upon the valuation made under the law is simply a tax on the property of the companies within the State of Ohio. Such a tax is not an interference with interstate commerce in the sense in which such an interference is prohibited by the Federal Constitution. *State Tax on Railway Gross Receipts,* 15 Wall. 284; *Cleveland, Cincinnati &c. Railway* v. *Backus,* 154 U. S. 439, and cases cited.

(*a*) The property of a corporation may be fairly valued as a unit for purposes of taxation.

This has been decided so often, and so definitely, that it would hardly seem to need additional argument. It is contended by counsel for appellants that the property of the companies included under this law should be valued item by item, and that the aggregate of value of the different items, taken separately, is the value of the property of the companies for taxation. The State of Ohio claims, on the contrary, that the real value of the property of the corporations under discussion cannot be ascertained by simply valuing the items of real and personal property taken separately, and finding the total. The entire property of any one of these corporations as a unit, and used for a specific purpose, and in a certain place, has a value to the corporation, by reason of its unity and the use to which it is put, which is much greater than the value of the mere items of property taken separately.

Taken together, it constitutes a plant, a machine, which has a value by reason of the assembling of its parts, the place where it is located, and the use to which it is put. This is the basis of its selling value. This fixes the selling value of its stock. This evidences the actual money invested, and which if not so invested would be taxed as money.

. (*b*) How shall the amount of property in Ohio be apportioned?

In the case of a telegraph company, the proportion which the mileage in Ohio bears to the mileage of the whole company, represents a fair proportion of the capital used in Ohio; and in the case of an express company, the proportionate length of the routes traversed by the company in Ohio to the entire routes traversed by the company, represents the fair proportion of the corporate capital or property used in Ohio. There may be exceptional circumstances, such as the existence of a large amount of real estate or some other specified property at the home office, which increases the proportion of the entire property to be found in that State, and decreases the proportion to be found in all other States. But this fact or facts should be brought to the attention of the board, and they are authorized to make due allowance for it, and it will be presumed that they did make full allowance for it.

It is thus seen that there is no tax laid on the property outside of the State, but such property is merely brought to the attention of the board for the purpose of aiding it in arriving at the value of the property as a whole in order to reach the value of the portion of the property used in the State. It is clear, also, that it is not the profits of the business that are being taxed; the profits of the business are not a subject of inquiry. The profitableness of the use of the property may contribute to the value of the property for taxation, but the profits' themselves are not taxed; they are not even known to the board.

It has been decided by the courts over and over again, that this method of valuing property is a fair one; that it constitutes a *bona fide* valuation of property for taxation; that it is, in effect as well as in name, a property tax; that it is not

a tax on the business, or the earnings. or the profits of the companies, but on their property; that the property of these corporations may be valued as a unit upon the basis of the value of their capital stock, and other evidence, and that the proportion of the entire valuation thus made, belonging to any one State, may be estimated on the mileage basis as above described. *State* v. *Jones,* 51 Ohio St. 492; *State Railroad Tax cases,* 92 U. S. 575; *Western Un. Tel. Co.* v. *Massachusetts,* 125 U. S. 530; *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18; *Marye* v. *Baltimore & Ohio Railroad,* 127 U. S. 117; *Cleveland, Cincinnati &c. Railway* v. *Backus,* 154 U. S. 439; *Western Un. Tel. Co.* v. *Taggart,* 163 U. S. 1.

*Mr. John K. Richards* for appellees. *Mr. F. S. Monnett,* Attorney General of the State of Ohio, and *Mr. John L. Lott,* Assistant Attorney General of that State, were on his brief.

I. Where the constitutionality of a law is involved, every possible presumption is in favor of its validity, and this continues until the contrary is shown beyond a reasonable doubt.

II. The Nichols law is based upon the essential difference existing between the property of telegraph, telephone and express companies, and other property. The property of these companies is in nature and use a unit, and to be justly valued, so that the companies may bear their fair share of the public burdens, must be treated for assessment purposes as a unit.

An express company owns horses, wagons, pouches, office furniture, safes and other implements for carrying on the transportation business; but it also owns leases of transportation facilities and capital and money to operate lines extending throughout the country. A part of this property has a situs in the towns where there are offices, a part is carried to and fro throughout the State on the lines over which the express company operates. The property is used together in one business, that of transportation, and is valuable because it is so used. An express company is akin to a railroad company. It operates over a large territory, or its property would not have the value it does. To operate lines extending over a

large territory requires a considerable capital, and this capital is of such a character that it can only be ascertained and valued as a unit and cannot be reached and assessed by local officers.

III. Because of these inherent differences, it is not only proper, but wise for the State to classify the property of these companies for taxation. Such classification does not violate the constitution of Ohio and is in accord with the legislative policy of the State. There are separate provisions for the valuation of the property of individuals, of merchants, of manufacturers, of unincorporated banks, of incorporated banks, of corporations in general, of railroads, of insurance companies. The end of the law is equality of burdens, which can only be reached through classification.

IV. The property of an express company constitutes a plant for transportation purpose. The assessment of the Ohio property did not exceed a fair proportion of the value of this plant, taking into consideration the value of the capital stock and other facts, whatever basis of apportionment may be taken. In fact, no rule of appraisement aside from that laid down in the Nichols law was adopted; the result presents the best judgment of the board, in the light of the law and all the facts before it. If the assessment be erroneous, it is in consequence of a mistake of judgment, which the court will neither review nor correct.

V. There is no denial of the equal protection of the law. The Federal cases recognize the right of a State to classify property for taxation, and use such methods of valuation as, in the judgment of the legislature, will result in an equality of burdens. *Barbier* v. *Connolly*, 113 U. S. 27; *Bell's Gap Railroad* v. *Pennsylvania*, 134 U. S. 232; *Home Ins. Co.* v. *New York*, 134 U. S. 594; *Pacific Express Co.* v. *Seibert*, 142 U. S. 339; *Charlotte, Columbia &c. Railroad* v. *Gibbes*, 142 U. S. 386; *Missouri Pacific Railway* v. *Mackey*, 127 U. S. 205; *State Railroad Tax cases*, 92 U. S. 575; *Kentucky Railroad Tax cases*, 115 U. S. 321.

VI. Due process of law is provided by the Nichols act, both in itself and when taken in connection with other stat-

utes.    There  are  provisions for  notice,  for  statements,  for
hearings,  for  review  and  correction  of  erroneous  and  excessive
valuations,  and  for  contesting  assessments.    *Davidson* v. *New
Orleans*, 96  U. S.  97; *Hagar* v. *Reclamation District*, 111
U. S.  701; *State Railroad Tax cases, ubi sup.*; *McMillen* v.
*Anderson*, 95  U. S.  37; *Kentucky Railroad Tax cases, ubi
sup.*; *Spencer* v. *Merchant*, 125  U. S.  345; *Palmer* v. *Mc-
Mahon*, 133  U. S.  660.

VII.  In the absence of an allegation of fraud, the action of
the board in fixing the valuation is conclusive, and the court
will not review its judgment to determine whether its valua-
tion is or is not excessive.    Courts do not constitute them-
selves taxing authorities to determine on evidence the value
of property for taxation.

*Mr. James C. Carter* for the American Express Company,
appellant.

Inasmuch as the State of Ohio had the rightful power to
impose a tax upon the property of the express companies
actually situated within its territory, if there is any invalidity
in the assessments under notice it must be found in the man-
ner in which they were laid.

What the State of Ohio assumed to do was to tax property,
not because of its ownership by citizens of the State, but irre-
spective of citizenship and on account of its situs within the
State.    Nor did it assume to impose a specific tax, but a tax
determinable by value.    This property of the express com-
panies was ordinary movable personal property, the actual
value of which in money was easily determinable in the ordi-
nary way.    The method actually employed was this: The
board required from the companies, and received (at least from
the American Express Company) statements showing the
value of its whole property, of that part actually situated in
Ohio, the nominal amount of its capital stock, and its actual
value as determined by the selling price of its shares.    If the
board had taken the actual value of the property in Ohio, it
would have assessed it, the personalty (for the year 1895, and

the difference between that and the other years is not material) at $23,430. The omissions to return some small items might slightly swell the amount. It utterly dismissed the actual value thus ascertained by the ordinary method, and proceeded with an attempt to ascertain what the value of it would be if it were treated as a certain fractional part of a supposed "unit profit-producing plant"; and to this end it assumed that the real value of the whole of this plant was determined by the value of the whole capital stock according to its selling price. Having thus ascertained the value of the whole unit plant, the problem remained to ascertain how much of that unit plant was in Ohio, and this was solved by the assumption that, as the actual value in Ohio of the specific personal property therein situated, valued according to the ordinary method, was to the value of the whole property of the company valued in like manner, so was the value of the part of the unit plant in Ohio to the whole value of the unit plant as determined by the whole value of the capital stock.

In this way property really of the value of $23,400 was valued and assessed for taxation for the year 1895 at $499,-377.60!

The case, as thus stated, hardly leaves room for argument, for argument would assume that the error is not obvious and flagrant, whereas it is so obvious and flagrant that it scarcely seems worth while to inquire into the nature of the error. The valuations declared by the board of assessors are — must be — either purely capricious and arbitrary, in which case the error is plain, or the result of applying some test of valuation which has no just or reasonable relation to value, in which case the error is equally plain.

I. The laws under which the assessments were made required this mode of valuation, and we are entitled — indeed bound in the absence of evidence to the contrary — to assume that the officers followed the law. But, whatever the Supreme Court of Ohio or the Circuit Court of Appeals may have thought as to whether the board was bound to regard the value of the entire capital stock as alone determining the value of the entire property; neither pretends that it was not

the principal test prescribed by the statute; and a law which makes a wholly erroneous test in the valuation of property the principal one, is just as invalid as if it made it the only one.

II. These proceedings were in conflict with those provisions of the Federal Constitution which forbid the taking of property without due process of law. The property to be assessed was wholly, or chiefly, personal chattels, such as horses, wagons, etc. They were specific things belonging to the company having an actual situs in Ohio and taxable by that State. The State proposed to value them, not as specific things, but as a part of a distinct whole, embracing these and many other things with them. Their value was easily ascertainable, in the ordinary method, by finding their market value, or the cost at which they could be produced and reproduced. The law required this ordinary mode to be ignored and a value to be placed upon them which should be determined by the value of the capital stock, a thing which had no relation whatever to their value; for nothing is more certain than that the value of this property would be precisely the same — could be bought for the same price — be sold for the same price — be produced and reproduced for the same price — whether the capital stock of the company was 50 per cent below, or 100 per cent above par.

Under this method of valuation, whether the horses were lame or sound, or old or young, whether the wagons and harness were old or new, was of little consequence; but any valuable franchises which the company might possess which increased the profits of its business in other States, however remote, every favorable contract with railroad companies which increased the profits of its business, immediately added to the value of every horse, wagon and harness in Ohio. And if a debt due to the company from a debtor in Ohio of $1000 was included in its property there it became subject to valuation for the purposes of taxation at more than $15,000!

Is this "a taking of property" without due process of law? Certainly it is, unless the requirement of "due process of law" can in all instances be satisfied by a mere statutory enactment.

We are not called upon at the present stage of constitutional jurisprudence to go into argument to show that this cannot be done. The safeguard which forbids the taking of property without due process of law is a protection against legislation. It cannot be met and overcome by a mere exercise of the power which it was erected to control.

Exact equality and justice is not possible in any system of taxation and no one expects it. There are many methods which may be employed and opinions differ concerning which is the best, and among these the legislature has an uncontrolled discretion. But one thing is essential to any method, and this is that it should have an eye to equality and uniformity. Without this, statutory enactments to compel the payment by the citizen of money in the name of taxes are mere arbitrary exactions; indeed their proper name is robbery, and they are none the less robbery because clothed with the exterior form of law.

The opinion seems to have been entertained in the Circuit Court of Appeal, and in the Supreme Court of Ohio, that the question whether the safeguard of due process of law was satisfied amounted simply to the question whether the property owner had under the law opportunity to appear before the assessing board and be heard. No greater error could be committed. Opportunity to appear and be heard is useful only when it affords a means of correcting injustice. It is valuable only when the party can appeal effectively to truth and justice. But of what use is it when the so-called law itself commands the injustice to be done? An appeal to the legal enactment is to no purpose in such a case.

Where the legislative power is arbitrary and unlimited, there is, of course, no protection against it to be found in the constitutional safeguard of the Fourteenth Amendment that no person shall be deprived of life, liberty and property without due process of law. But it has been more than once declared, with the approval of this court, that under our American systems there is no room for the exercise of arbitrary power.

The objection that men differ as to what these fundamental principles are cannot be listened to. It questions the existence of the principles, and thus utterly destroys constitutional gov-

ernment. We have no other ground for saying that a judicial proceeding, which denies to the defendant an opportunity to be heard, is unconstitutional, except that it violates the fundamental principles of reason and justice. But it is not true that civilized and enlightened men differ as to these principles. Upon all material points they are agreed. Were they not thus agreed constitutional government would be impossible. They are agreed, in the main, upon all the dictates of right reason, and so far as they are not agreed, so far our constitutional systems are imperfect, as all human institutions are.

In the application, indeed, of fundamental principles of reason and justice to legal enactments there are wide differences of opinion, and the difficulty thus occasioned is surmounted, so far as it can be, by the rule that laws are not to be pronounced unconstitutional except when they are clearly violative of such principles.

III. The laws in question are very clearly in violation of the constitution of the State of Ohio, and for this reason invalid.

IV. The laws in question impose taxes on property beyond the territorial jurisdiction of Ohio and are invalid for this reason.

V. The laws authorizing the assessments are invalid as an invasion of the constitutional guaranty of the equal protection of the laws.

VI. The laws under which these assessments were made are invalid also for the reason that they impose a burden upon interstate commerce.

There is no constitutional provision in terms forbidding the States to impose burdens by way of taxation upon interstate commerce. The prohibition is a necessary implication arising from the fact that the subject-matter is one placed exclusively under the sovereign control of Congress, and the imposition of burdens upon it by the States, whether by taxation or otherwise, would be a denial of that sovereignty and a false assumption by the States of a power over it, which, if it existed, might be so exercised as to destroy it.

There is one necessary exception to the rule that the States

cannot tax interstate commerce. Inasmuch as the existence of the States is necessary to the existence of interstate commerce, that ordinary system of taxation which is necessary to the existence of the States, namely, taxation upon all the property within them, must be permitted, and the property employed in interstate commerce is not to be exempted. This exception is, indeed, rather apparent than real; for where no burden can be put upon property employed in interstate commerce without being at the same time put upon all other property, interstate commerce is not really burdened. Were it not subject to taxation in this form the effect would be to confer upon it an affirmative advantage equivalent to a pecuniary bounty equal to the amount of the tax from which it was exempted.

But a tax in any other form cannot be thus equalized over all private interests, and, if allowed, would be, or might easily be made to be, an especial burden.

The taxes levied by these Ohio laws are taxes directly depending upon the market value of the shares of the stockholders. That market value depends directly upon the present profits of the business and the fair expectation concerning its permanency. It is, very precisely, a capitalization of all the property and every advantage whether by way of franchise, contract privilege or skill possessed by the company. Among these advantages is the fact that the privilege of carrying it on is derived from and controlled by another sovereign government. A tax, therefore, upon a capitalization of all these elements is a tax upon the occupation itself, which it is certain that the States have no right to impose.

The practical test is conclusive. The question is whether the taxes are a burden. Every one can see that if all the States should impose taxes similar to those we are dealing with (and if one State can do it all may), the business would be immediately destroyed. No express company could stand such an aggregate of taxation.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

No difference material to the determination of the controversy exists between the cases, and as matter of convenience the statement refers to the amended act and the records in Nos. 398, 399 and 400.

The contention that the act in question is invalid because repugnant to the constitution of the State of Ohio has been disposed of by the decision of the highest tribunal of that State sustaining its validity. *State* v. *Jones,* 51 Ohio St. 492. These cases fall within no recognized exception to the general rule that the construction by the state courts of last resort of state constitutions and statutes will ordinarily be accepted by this court as controlling.

It is suggested that the decision of the Supreme Court of Ohio should not be followed because the case in which it was announced did not involve a genuine controversy but was prepared for the purpose of obtaining an adjudication, and, under the circumstances, ought not to have been considered by that court. But it was for that tribunal to pass on this question, and, as it entertained jurisdiction and delivered a considered opinion which appears in the official reports of the court as its judgment of the validity of the Nichols law under the constitution of the State of Ohio, it is not within our province to review its determination in that regard.

This brings us to the only inquiry which it concerns us to examine.

The legislation in question is claimed to be repugnant to the Constitution of the United States because in violation of the commerce clause of that instrument, and because operating to deprive appellants of their property without due process of law, and of the equal protection of the laws.

We assume that the assessments complained of were made in pursuance of the definite rule or principle of appraisement recognized and established by the Nichols law, as construed by the Supreme Court of Ohio, and the question is whether the law prescribing that rule is valid under the Federal Constitution.

The principal contention is that the rule contravenes the commerce clause because the assessments, while purporting to

be on the property of complainants within the State, are in fact levied on their business, which is largely interstate commerce.

Although the transportation of the subjects of interstate commerce, or the receipts received therefrom, or the occupation or business of carrying it on, cannot be directly subjected to state taxation, yet property belonging to corporations or companies engaged in such commerce may be; and whatever the particular form of the exaction, if it is essentially only property taxation, it will not be considered as falling within the inhibition of the Constitution. Corporations and companies engaged in interstate commerce should bear their proper proportion of the burdens of the governments under whose protection they conduct their operations, and taxation on property, collectible by the ordinary means, does not affect interstate commerce otherwise than incidentally, as all business is affected by the necessity of contributing to the support of government. *Postal Telegraph Cable Co.* v. *Adams*, 155 U. S. 688.

As to railroad, telegraph and sleeping car companies, engaged in interstate commerce, it has often been held by this court that their property, in the several States through which their lines or business extended, might be valued as a unit for the purposes of taxation, taking into consideration the uses to which it was put and all the elements making up aggregate value, and that a proportion of the whole fairly and properly ascertained might be taxed by the particular State, without violating any Federal restriction. *Western Union Telegraph Co.* v. *Massachusetts*, 125 U. S. 530; *Massachusetts* v. *Western Union Telegraph Co.*, 141 U. S. 40; *Maine* v. *Grand Trunk Railway*, 142 U. S. 217; *Pittsburgh, Cincinnati &c. Railway* v. *Backus*, 154 U. S. 421; *Cleveland, Cincinnati &c. Railway* v. *Backus*, 154 U. S. 439; *Western Union Telegraph Co.* v. *Taggart*, 163 U. S. 1; *Pullman's Palace Car Co.* v. *Pennsylvania*, 141 U. S. 18. The valuation was, thus, not confined to the wires, poles and instruments of the telegraph company; or the roadbed, ties, rails and spikes of the railroad company; or the cars of the sleeping car company; but

included the proportionate part of the value resulting from the combination of the means by which the business was carried on, a value existing to an appreciable extent throughout the entire domain of operation. And it has been decided that a proper mode of ascertaining the assessable value of so much of the whole property as is situated in a particular State, is in the case of railroads, to take that part of the value of the entire road which is measured by the proportion of its length therein to the length of the whole, *Pittsburgh &c. Railway* v. *Backus,* 154 U. S. 421; or taking as the basis of assessment such proportion of the capital stock of a sleeping car company as the number of miles of railroad over which its cars are run in a particular State bears to the whole number of miles traversed by them in that and other States, *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18; or such a proportion of the whole value of the capital stock of a telegraph company as the length of its lines within a State bears to the length of all its lines everywhere, deducting a sum equal to the value of its real estate and machinery subject to local taxation within the State, *Western Un. Tel. Co.* v. *Taggart,* 163 U. S. 1.

Doubtless there is a distinction between the property of railroad and telegraph companies and that of express companies. The physical unity existing in the former is lacking in the latter; but there is the same unity in the use of the entire property for the specific purpose, and there are the same elements of value arising from such use.

The cars of the Pullman Company did not constitute a physical unity, and their value as separate cars did not bear a direct relation to the valuation which was sustained in that case. The cars were moved by railway carriers under contract, and the taxation of the corporation in Pennsylvania was sustained on the theory that the whole property of the company might be regarded as a unit plant, with a unit value, a proportionate part of which value might be reached by the state authorities on the basis indicated.

No more reason is perceived for limiting the valuation of the property of express companies to horses, wagons and furniture, than that of railroad, telegraph and sleeping car

companies, to roadbed, rails and ties; poles and wires; or cars. The unit is a unit of use and management, and the horses, wagons, safes, pouches and furniture; the contracts for transportation facilities; the capital necessary to carry on the business, whether represented in tangible or intangible property, in Ohio, possessed a value in combination and from use in connection with the property and capital elsewhere, which could as rightfully be recognized in the assessment for taxation in the instance of these companies as the others.

We repeat that while the unity which exists may not be a physical unity, it is something more than a mere unity of ownership. It is a unity of use, not simply for the convenience or pecuniary profit of the owner, but existing in the very necessities of the case — resulting from the very nature of the business.

The same party may own a manufacturing establishment in one State and a store in another, and may make profit by operating the two, but the work of each is separate. The value of the factory in itself is not conditioned on that of the store or *vice versa*, nor is the value of the goods manufactured and sold affected thereby. The connection between the two is merely accidental and growing out of the unity of ownership. But the property of an express company distributed through different States is as an essential condition of the business united in a single specific use. It constitutes but a single plant, made so by the very character and necessities of the business.

It is this which enabled the companies represented here to charge and receive within the State of Ohio for the year ending May 1, 1895, $282,181, $358,519 and $275,446, respectively, on the basis, according to their respective returns, of $42,065, $28,438 and $23,430, of personal property owned in that State, returns which confessedly do not, however, take into account contracts for transportation and accompanying facilities.

Considered as distinct subjects of taxation, a horse is, indeed, a horse; a wagon, a wagon; a safe, a safe; a pouch, a pouch; but how is it that $23,430 worth of horses, wagons, safes

and pouches produces $275,446 in a single year? Or $28,438 worth, $358,519? The answer is obvious.

Reliance seems to be placed by counsel on the observation of Mr. Justice Lamar, in *Pacific Express Company* v. *Seibert*, 142 U. S. 339, 354, that "express companies, such as are defined by this act, have no tangible property, of any consequence, subject to taxation under the general laws. There is, therefore, no way by which they can be taxed at all unless by a tax upon their receipts for business transacted." But the reference was to the legislation of the State of Missouri, and the scheme of taxation under consideration here was not involved in any manner.

The method of assessment provided by the Nichols law was as follows: "The said board shall proceed to ascertain and assess the value of the property of said express, telegraph and telephone companies in Ohio, and in determining the value of the property of said companies in this State, to be taxed within the State and assessed as herein provided, said board shall be guided by the value of said property as determined by the value of the entire capital stock of said companies, and such other evidence and rules as will enable said board to arrive at the true value in money of the entire property of said companies within the State of Ohio, in the proportion which the same bears to the entire property of said companies, as determined by the value of the capital stock thereof, and the other evidence and rules as aforesaid."

And this provision was thus construed by the Supreme Court of Ohio in *State* v. *Jones*:

"The board, in determining the value of the company's property in this State for taxation, is not required to fix the value of such property upon the principle that the value of the entire property of the company shall be deemed the same as the value of its entire capital stock, thus making the respective values equivalents of each other. But, taking the market value of the entire capital stock as a datum, the board is to be only guided thereby in ascertaining the true value in money of the company's property in this State. The statute does not bind the board to find the value

of the entire property of the company equal to that of the entire capital stock."

· The court further said :

· "But the property of a corporation may. be regarded in the aggregate, as a unit, an entirety, as a plant designed for a specific object; and its value may be estimated not in parts, but taken as a whole. If the market value — perhaps the closest approximation to the true value in money — of the corporate property as a whole, were inquired into, the market value of the capital stock would become a controlling factor in fixing the value of the property. Should all the stockholders unite to sell the corporate plant as an entirety, they would not be inclined to sell it for less than the market value of the aggregate shares of the capital stock. Besides, while the amount of the capital stock may be limited by the charter and the laws governing it, the real and personal property of the corporation may be constantly augmented, and may keep pace with any increase in the value of the capital stock. The market value of the capital stock, it is urged, has no necessary relation to the value of the tangible property of the corporation. But such is the well understood relation between the two that not only is the value of the capital stock an essential factor in fixing the market value of the corporate plant, but the corporate capital or property has a reflex action on the value of the capital stock. . . .

"If by reason of the good will of the concern, or the skill, experience and energy with which its business is conducted, the market value of the capital stock is largely increased, whereby the value of the tangible property of the corporation, considered as an entire plant, acquires a greater market value than it otherwise would have had, it cannot properly be said not to be its true value in money within the meaning of the Constitution, because good will and other elements indirectly entered into its value. The market value of property is what it will bring when sold as such property is ordinarily sold in the community where it is situated ; and the fact that it is its market value cannot be questioned because attributed some-

what to good will, franchise, skilful management of the property or any other legitimate agency.

"It will, we think, be conceded that the earning capacity of real estate owned by the individuals may be considered in fixing its value for taxation. Take an office building on a prominent street in one of our large cities. It will not be doubted, that by care in the selection of tenants, and in the preservation of the reputation of the building, by superior elevator service, by vigilance in guarding and protecting the property, by the exercise of skill and knowledge in the general management of the premises, a good will of the establishment will be promoted, which will tend to an extra increase in the earning capacity and value of the building. For the purpose of taxation, it would be none the less the true value in money of the building, because contributed to by the operative causes that gave rise to the good will. We discover no satisfactory reason why the same rule should not apply to the valuation of corporate property — why the selling value of the capital stock, as affected by the good will of the business, should be excluded from the consideration of the board of appraisers and assessors under the Nichols law, charged with the valuation of corporate property in this State, especially as the capital stock, when paid up, practically represents at least an equal value of the corporate property."

Similar views were expressed by the Circuit Court of Appeals, *Sanford* v. *Poe*, 37 U. S. App. 378, 395, Judge Lurton, delivering the opinion, saying:

"The tax imposed is not a license tax, nor a tax on the business or occupation, nor on the transportation of property through the State, nor from points within the State to points in other States, nor from points in other States to points within the State. It purports to provide for a tax upon property within the State of Ohio. Though this property is employed very largely in the business of interstate commerce, yet that does not exempt it from the same liability to taxation as all other property within the jurisdiction of Ohio. This proposition is too well settled to need argument. . . .

"Neither does the fact that the property of the express com-

panies was valued as a unit profit-producing plant violate any Federal restriction upon the taxing power of a State within which a part of that plant is found. The value of property depends in a large degree upon the use to which it is put. If a railroad may be valued as a unit, rather than as a given number of acres of land, plus so many tons of rails and so many thousand ties and a certain number of depots, shops, etc., there is no sufficient reason why the property of an express company should not be treated as a unit plant. If the State of Ohio had a right to tax the property within the State, and to assess it at its true cash value, there is no Federal restriction which will prevent such property from being ' assessed at the value which it has, as used, and by reason of its use.' . . .

"That an express company owns no line of railway and operates no railroad does not prevent the value of its property from being affected by the relation of each part to every other part, and the use to which a part is put as a factor in a unit business."

The line of reasoning thus pursued is in accordance with the decisions of this court already cited. Assuming the proportion of capital employed in each of several States through which such a company conducts its operations has been fairly ascertained, while taxation thereon, or determined with reference thereto, may be said in some sense to fall on the business of the company, it is only indirectly. The taxation is essentially a property tax, and, as such, not an interference with interstate commerce.

Nor, in this view, is the assessment on property not within the jurisdiction of the taxing authorities of the State and for that reason amounting to a taking of property without due process of law. The property taxed has its actual situs in the State and is, therefore, subject to the jurisdiction, and the distribution among the several counties is a matter of regulation by the state legislature. *Pullman's Palace Car Co.* v. *Pennsylvania*, 141 U. S. 18, 22; *State Railroad Tax cases*, 92 U. S. 575; *Delaware Railroad Tax*, 18 Wall. 206; *Erie Railroad* v. *Pennsylvania*, 21 Wall. 492; *Columbus Southern Railway* v. *Wright*, 151 U. S. 470.

In *Pullman's Palace Car Co.* v. *Pennsylvania,* the rule is considered that personal property may be separated from its owner and he may be taxed, on its account, at the place where it is, although not the place of his own domicil, and even if he is not a citizen or a resident of the State which imposes the tax; and the distinction between ships and vessels and other personal property is pointed out. The authorities are largely examined and need not be gone over again.

There is here no attempt to tax property having a situs outside of the State, but only to place a just value on that within. Presumptively all the property of the corporation or company is held and used for the purposes of its business, and the value of its capital stock and bonds is the value of only that property so held and used.

Special circumstances might exist, as indicated in *Pittsburgh, Cincinnati &c. Railway* v. *Backus,* 154 U. S. 421, 443, which would require the value of a portion of the property of an express company to be deducted from the value of its plant as expressed by the sum total of its stock and bonds before any valuation by mileage could be properly arrived at, but the difficulty in the cases at bar is that there is no showing of any such separate and distinct property which should be deducted, and its existence is not to be assumed. It is for the companies to present any special circumstances which may exist, and, failing their doing so, the presumption is that all their property is directly devoted to their business, which being so, a fair distribution of its aggregate value would be upon the mileage basis.

The States through which the companies operate ought not to be compelled to content themselves with a valuation of separate pieces of property disconnected from the plant as an entirety, to the proportionate part of which they extend protection, and to the dividends of whose owners their citizens contribute.

It is not contended that notice of the time and place of the meetings of the board was not afforded or that the companies were denied the opportunity to appear and submit such proofs, explanations, suggestions and arguments with reference to the assessment as they desired.

We are, also, unable to conclude that the classification of express companies with railroad and telegraph companies as subject to the unit rule, denies the equal protection of the laws. That provision in the Fourteenth Amendment "was not intended to prevent a State from adjusting its system of taxation in all proper and reasonable ways," nor was that amendment "intended to compel a State to adopt an iron rule of equal taxation." *Bell's Gap Railroad* v. *Pennsylvania*, 134 U. S. 232.

In *Pacific Express Co.* v. *Seibert*, 142 U. S. 339, 351, in which a tax on gross receipts of express companies in the State of Missouri was sustained, Mr. Justice Lamar, speaking for the court, well says:

"This court has repeatedly laid down the doctrine that diversity of taxation, both with respect to the amount imposed and the various species of property selected either for bearing its burdens or for being exempt from them, is not inconsistent with a perfect uniformity and equality of taxation in the proper sense of those terms; and that a system which imposes the same tax upon every species of property, irrespective of its nature or condition or class, will be destructive of the principle of uniformity and equality in taxation and of a just adaptation of property to its burdens."

And see *Kentucky Railroad Tax cases*, 115 U. S. 321; *Home Insurance Co.* v. *New York*, 134 U. S. 594.

The policy pursued in Ohio is to classify property for taxation, when the nature of the property, or its use, or the nature of the business engaged in, requires classification, in the judgment of the legislature, in order to secure equality of burden; and property of different sorts is classified under various statutory provisions for the purposes of assessment and taxation. The state constitution requires all property to be taxed by a uniform rule and according to its true value in money, and it was held by the Supreme Court of Ohio in *State* v. *Jones* that the Nichols law did not violate that requirement.

In *Wagoner* v. *Loomis*, 37 Ohio St. 571, it was ruled that: "Statutory provisions, whereby different classes of property are listed and valued for taxation in and by different modes

and agencies, are not necessarily in conflict with the provisions of the constitution which require all property to be taxed by a uniform rule and according to its true value in money." And the court said: "A faithful execution of the different provisions of the statutes would place upon the duplicate for taxation all the taxable property of the State, whether bank stocks or other personal property or real estate, according to its true value in money; and the equality required by the constitution has no other test."

The constitutional test was held to be complied with, whatever the mode, if the result of the assessment was that the property was assessed at its true value in money.

Considering, as we do, that the unit rule may be applied to express companies without disregarding any other Federal restriction, we think it necessarily follows that this law is not open to the objection of denying the equal protection of the laws.

We have said nothing in relation to the contention that these valuations were excessive. The method of appraisement prescribed by the law was pursued and there were no specific charges of fraud. The general rule is well settled that "whenever a question of fact is thus submitted to the determination of a special tribunal, its decision creates something more than a mere presumption of fact, and if such determination comes into inquiry before the courts it cannot be overthrown by evidence going only to show that the fact was otherwise than as so found and determined." *Pittsburgh, Cincinnati &c. Railway* v. *Backus*, 154 U. S. 434; *Western Union Telegraph Co.* v. *Taggart*, 163 U. S. 1.

*Decrees affirmed.*


Mr. Justice White, with whom concurred Mr. Justice Field, Mr. Justice Harlan and Mr. Justice Brown, dissenting.

Not being able to concur in the opinion and judgment of the court in the foregoing cases, I am impelled, by what I conceive to be the serious nature of the questions involved, to state the reasons for my dissent.

It is elementary that the taxing power of one government cannot be lawfully exerted over property not within its jurisdiction or territory and within the territory and jurisdiction of another. The attempted exercise of such power would be a clear usurpation of authority, and involve a denial of the most obvious conceptions of government. This rule, common to all jurisdictions, is peculiarly applicable to the several States of the Union, as they are by the Constitution confined within the orbit of their lawful authority, which they cannot transcend without destroying the legitimate powers of each other, and, therefore, without violating the Constitution of the United States.

This limitation upon the taxing power was early declared by Mr. Chief Justice Marshall in *McCulloch* v. *Maryland*, 4 Wheat. 316, where it was said (p. 429):

" All subjects over which the sovereign power of a State extends are objects of taxation; but those over which it does not extend are, upon the soundest principles, exempt from taxation. This proposition may almost be pronounced self-evident."

In *Hays* v. *Pacific Mail Steamship Co.*, 17 How. 596, a tax imposed upon twelve steamships belonging to the company, which, while engaged in lawful trade and commerce between the port of San Francisco and ports and territories without the State, were temporarily within the jurisdiction of California, was held illegal. This court, by Mr. Justice Nelson, declared that the vessels were not properly abiding within the limits of California, so as to become incorporated with the other personal property of that State; that their situs was at the home port where the vessels belonged and where the owners were liable to be taxed for the capital invested and where the tax had been paid.

In *St. Louis* v. *Ferry Co.*, 11 Wall. 423, the validity of a tax assessed by the city of St. Louis upon the boats of a ferry company, an Illinois corporation, as property within the city of St. Louis, was considered. This court held that Illinois was the home port of the boats, that they were beyond the jurisdiction of the authorities by which the taxes were assessed,

and that the validity of the taxes could not be maintained. It was observed (p. 430):

"Where there is jurisdiction neither as to person nor property, the imposition of a tax would be *ultra vires* and void. If the legislature of a State should enact that the citizens or property of another State or country should be taxed in the same manner as the persons and property within its own limits and subject to its authority, or in any manner whatsoever, such a law would be as much a nullity as if in conflict with the most explicit constitutional inhibition. Jurisdiction is as necessary to valid legislative as to valid judicial action."

In *State Tax on Foreign-held Bonds*, 15 Wall. 300, a tax laid by the State of Pennsylvania on the interest paid by the railroad company on its bonds, was held to be a tax upon the bonds, the property not of the debtor company but of its creditors, and that so far as such bonds were held by non-residents of the State, they were property beyond its jurisdiction. It was declared that no adjudication should be necessary to establish so obvious a proposition as that property lying beyond the jurisdiction of a State is not a subject upon which the taxing power can be legitimately exercised, and that "the power of taxation, however vast in its character and searching in its extent, is necessarily limited to subjects within the jurisdiction of the State." Of the act there under consideration, the court said (p. 321):

"It is only one of many cases where, under the name of taxation, an oppressive exaction is made without constitutional warrant, amounting to little less than an arbitrary seizure of private property. It is, in fact, a forced contribution levied upon property held in other States, where it is subjected or may be subjected to taxation upon an estimate of its full value."

In *Morgan v. Parham*, 16 Wall. 471, it was adjudged, upon the authority of the *Hays case, supra*, that the State of Alabama could not lawfully tax a vessel registered in New York, but employed in commerce between Mobile in that State and New Orleans in Louisiana. The situs of the ves-

sel was held to be at the home port in New York, where its
owner was liable to be taxed for its value.

The circumstance that the steamer might not actually have
been taxed in New York during the years for which the taxes
in controversy were levied was held to be unimportant. The
court said (p. 478):

"Whether the steamer Frances was actually taxed in New
York during the years 1866 and 1867 is not shown by the
case. It is not important. She was liable to taxation there.
That State alone had dominion over her for that purpose."

In *The Delaware Railroad Tax case*, 18 Wall. 206, this
court, in considering an objection interposed to a taxing act,
that it imposed taxes upon property beyond the jurisdiction of
the State, observed (p. 229): "If such be the fact, the tax to
that extent is invalid, for the power of taxation of every State
is necessarily confined to subjects within its jurisdiction."

In *Gloucester Ferry Co. v. Pennsylvania*, 114 U. S. 196, at
pages 206–209, Mr. Justice Field reviews the cases just cited.
The Gloucester Ferry Company was a New Jersey corpora-
tion, and operated a ferry between Gloucester, New Jersey,
and Philadelphia. The State of Pennsylvania laid a tax on
the appraised value of the capital stock of the ferry company,
which owned no property in Pennsylvania except the lease of
a slip or dock, where its ferryboats put up in plying across the
river, between the two States.

In this court it was sought in argument to support the tax
in question by advancing the theory of "a homogeneous unit."
The counsel said (p. 201):

"The tax is upon the capital stock of the corporation, 'not
in separate parcels, as representing distinct properties, but as
a homogeneous unit, partaking of the nature of personalty,'
and taxable where its corporate functions are exercised or its
business done. The franchise itself may constitute the mate-
rial part of all its property, since not only its wharves and slips,
but also its boats, might be leased, and, in that case, the tax
would be measured by the value of the franchise represented
by the extent of its exercise within the State, and not by its
tangible property situated there. The extent of its property

subject to the taxing power is immaterial.  Its franchise would be worthless without the leasehold interest owned by it in the city of Philadelphia.  The value of its franchise depends upon that leasehold, and it will, therefore, not do to say that it has no property within the jurisdiction of the taxing power.  It does not seem necessary to inquire further as to an ownership of property within the jurisdiction of Pennsylvania."

But this court, speaking through Mr. Justice Field, completely answered the argument, as follows (p. 205):

"If by reason of landing or receiving passengers and freight at wharves, or other places in a State, they can be taxed by the State on their capital stock on the ground that they are thereby doing business within her limits, the taxes which may be imposed may embarrass, impede and even destroy such commerce with the citizens of the State.  If such a tax can be levied at all, its amount will rest in the discretion of the State. It is idle to say that the interests of the State would prevent oppressive taxation.  Those engaged in foreign and interstate commerce are not bound to trust to its moderation in that respect; they require security."

Of the *Gloucester Ferry case*, it was observed by this court in *Philadelphia Steamship Co.* v. *Pennsylvania*, 122 U. S. 326, 344, that "It is hardly necessary to add that the tax on the capital stock of the New Jersey company, in that case, was decided to be unconstitutional, because, as the corporation was a foreign one, the tax could only be construed as a tax for the privilege or franchise of carrying on its business, and that business was interstate commerce."

In *Erie Railroad* v. *Pennsylvania*, 153 U. S. 628, 646, this court denied the power of the State of Pennsylvania to require a foreign railroad company doing business within its borders to deduct therefrom when paying interest upon its obligations in New York the amount of a tax assessed by the State upon the bonds and moneyed capital owned by the residents of Pennsylvania.  The money in the hands of the company in New York was held to be property beyond the jurisdiction of Pennsylvania.  The court said that: "No principle is better settled than that the power of a State, even its power of taxa-

tion, in respect to property, is limited to such as is within its jurisdiction."

This inherent want of power in every government to transcend its jurisdiction is subject, as already stated, to an additional limitation as to the several States of the Union, resulting from those provisions of the Constitution of the United States which, in so far as they restrict the power of the States, necessarily create limitations to which they are all subject and from which they cannot depart without a violation of the Constitution. It will not be necessary to allude to every special restriction on the power of the States resulting from the Constitution, but it will suffice for my present purpose to refer to one only, the necessary existence of which has often been recognized to have been one of the most cogent motives leading to the adoption of the Constitution, and upon the enforcement of which it has often been declared the perpetuity of our institutions depends, to wit, the inhibition resulting from the provision of the Constitution of the United States conferring on Congress power to regulate interstate commerce.

Under the interstate commerce clause of the Constitution, as held by this court, speaking through Mr. Justice Bradley, in *Leloup* v. *Mobile*, 127 U. S. 640, 648, "No State has the right to lay a tax on interstate commerce in any form, whether by way of duties laid on the transportation of the subjects of that commerce, or on the receipts derived from that transportation, or on the occupation or business of carrying it on, and the reason is that such taxation is a burden on that commerce, and amounts to a regulation of it, which belongs solely to Congress." The following cases were referred to as supporting the proposition thus enunciated: *Case of State Freight Tax,* 15 Wall. 232; *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.,* 96 U. S. 1; *Mobile* v. *Kimball,* 102 U. S. 691; *Western Union Telegraph Co.* v. *Texas,* 105 U. S. 460; *Moran* v. *New Orleans,* 112 U. S. 69; *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196; *Brown* v. *Houston,* 114 U. S. 622; *Walling* v. *Michigan,* 116 U. S. 446; *Picard* v. *Pullman Southern Car Co.,* 117 U. S. 34; *Wabash &c. Railway Co.* v. *Illi-*

nois, 118 U. S. 557; *Robbins* v. *Shelby County Taxing District*, 120 U. S. 489; *Philadelphia & Southern Steamship Co.* v. *Pennsylvania*, 122 U. S. 326; *Western Union Telegraph Co.* v. *Pendleton*, 122 U. S. 347; *Ratterman* v. *Western Union Telegraph Co.*, 127 U. S. 411.

The following cases, since decided, enforced the same principle: *Asher* v. *Texas*, 128 U. S. 129; *Stoutenburgh* v. *Hennick*, 129 U. S. 141; *Lyng* v. *Michigan*, 135 U. S. 161; *McCall* v. *California*, 136 U. S. 104; and *Crutcher* v. *Kentucky*, 141 U. S. 47.

These authorities were reviewed by this court in *Brennan* v. *Titusville*, 153 U. S. 289, where, speaking through Mr. Justice Brewer, it was held that a municipal corporation could not lawfully tax a non-resident manufacturer of goods for the privilege of endeavoring to sell his goods by means of an agent sent into the State to solicit orders therefor. This court there said (p. 303): "This tax is a direct charge and burden upon the business; and if a State may lawfully exact it, it may increase the amount of this exaction until all interstate commerce in this mode ceases to be possible. And notwithstanding the fact that the regulation of interstate commerce is committed by the Constitution to the United States, the State is enabled to say that it shall not be carried on in this way, and to that extent to regulate it."

The question then arises, does the tax imposed by the State of Ohio upon express companies violate either of the two elementary propositions to which I have just referred?

Under the law of Ohio express companies are taxed in three forms: First, their real estate is assessed for state, county and municipal purposes in the same manner as is real estate within the State belonging to other companies and persons; second, such companies are also taxed upon their gross receipts derived from business done within the State, 91 Ohio Laws, 237; and, third, they are additionally assessed by a state board. 90 Ohio Laws, 330, as amended by 91 Ohio Laws, 220. It is the assessment resulting from the last of these provisions which is involved in the cases now under consideration.

In compliance with the law the companies returned to the state board a statement for the year 1893, showing, first, the amount of capital stock and its par and market value; second, a detailed account of the entire real and personal property of the companies and its assessed value; and, third, their entire gross receipts during the taxing year for business done within the State of Ohio. For the years 1894 and 1895 the statements, under the requirements of the amendatory statute of May 10, 1894, 91 Ohio Laws, 220, exhibited, first, the number of shares of capital stock and its par and market value; second, a detailed statement of the real estate owned in Ohio and its assessed value; third, a full and correct inventory of the personal property, including moneys and credits owned in Ohio and the value thereof; fourth, the total value of the real and personal property owned and situate outside of Ohio; fifth, the entire gross receipts of the company, from whatever source derived, of business wherever done for the taxing year; and, sixth, the gross receipts of each company in Ohio, from whatever source derived.

It is proper here to notice that while the gross receipts in Ohio of express companies was required to be stated, there was no direction that mention should be made of the sum of the payments properly chargeable against such gross receipts, to wit, disbursements to railroad companies or individuals for transportation facilities, wages of its army of employés, care and maintenance of its horses, and other operating expenses.

Although the assessment on the real estate and on the gross receipts may be relevant to some aspects of the controversy now examined, I eliminate them from consideration, as the direct issue here presented concerns the taxation asserted to be only upon the personal property.

The value of the personal property within the State of Ohio returned by the express companies was averred in each bill, and was conceded by the demurrer to have been correct. The valuation thus returned and the amount of the assessment levied on such personal property by the state board is shown in the following table:

### Assessment for 1893.

| | Value as returned, and as alleged in the bills. | Value assessed by state board. |
|---|---|---|
| Adams Express Co | $53,080 74 | $460,033 08 |
| American Express Co | 27,300 00 | 400,576 45 |
| United States Express Co | 26,318 00 | 397,300 00 |

### Assessment for 1894.

| | | |
|---|---|---|
| Adams Express Co | $41,102 60 | $543,569 00 |
| American Express Co | 21,795 00 | 446,142 00 |
| United States Express Co | 26,333 00 | 481,348 00 |

### Assessment for 1895.

| | | |
|---|---|---|
| Adams Express Co | $42,065 00 | $533,095 80 |
| American Express Co | 23,430 00 | 499,373 60 |
| United States Express Co | 28,438 00 | 488,264 70 |

It thus appears that for the year 1893, property possessing an actual value of but $106,698.74 was assessed as being worth $1,257,909.53; in 1894 property valued at $89,230.60 was assessed at $1,471,059.00; and for 1895 property worth but $93,933.00 was assessed at $1,520,734.10; a total valuation during three years of property worth only $289,862.34 at $4,249,702.63.

In addition to this enormous taxation, the real estate and the gross receipts of the companies have also been taxed for all state, county and municipal purposes. It cannot, I submit, be asserted with reason that the nearly four millions of excess on the assessment of the tangible property laid by the state board resulted from assessing only the actual intrinsic value of such property, since to so contend would be not only beyond all reason, but would also be destructive of the admission by the demurrer that the companies possessed no other personal property within the State of Ohio but that returned by them, and that its actual and intrinsic value was correctly set forth. The assessment, therefore, must necessarily have taken into consideration some other property, or some element of value other than the real intrinsic worth of the property assessed.

The fact of the vast excess of the valuation over and above the admitted value of the property is not, however, the only mode by which it is conclusively demonstrated that the assessment resulted from the consideration and estimate by the state board of sources of value extrinsic to the property assessed. One of the assessments in controversy was made under the Ohio law of April 27, 1893, and the others under the law of May 10, 1894, and although there is some difference between the two statutes, they both, as I have already said, substantially require express companies to make return of their real and personal property within the State, the value thereof, the number of shares of their capital stock, their market value; and a statement of the gross receipts for business done within the State of Ohio during the taxing year from whatever source derived. Considering the obligation thus imposed to report the total value of the stock of the companies and all their gross earnings, as also the total routes over which their agents travelled, etc., and putting these things in connection with the extraordinary amount by which the valuation exceeds the actual value of the property assessed, it leaves no reasonable doubt that the sources of reported value, which were entirely outside of the territory and beyond the jurisdiction of the State of Ohio, were by some process of calculation added to the intrinsic value of the property within the State, thereby assessing not only the property within the State, but a proportion also of all the property situated without its territorial boundaries.

The fact that it was by this method that the sum of the personal property liable for taxation was fixed by the board, results clearly and unmistakably from the opinion of the Supreme Court of the State of Ohio in *State* v. *Jones*, 51 Ohio St. 492, in which case the court sustained the validity of the taxes here questioned. The Supreme Court of Ohio therein declared that the state board, whose duty it was to assess express companies, was " not *required* [1] to fix the value of such property upon the principle that the value of the entire property of the company shall be deemed the same as the value of

---

[1] The italics here and elsewhere in this quotation are mine.

its entire capital stock, thus making the respective values equivalents of each other. But, taking the market value of the entire capital stock as a datum, the board is only to be guided thereby in ascertaining the true value in money of the company's property *in this State.* The statute does not bind the board to find the value of the entire property of the company equal to that of the entire capital stock." Although the requirement in so many words, to assess property outside the State, is thus said not to be found in the statute, yet that it in substance so provides is acknowledged; for, adds the Ohio court, " the property of a corporation may be regarded in the aggregate *as a unit, an entirety, as a plant designed for a specific object; and its value may be estimated, not in parts, but taken as a whole.* If the market value — perhaps the closest approximation to the true value in money — of the corporate property as a whole were inquired into, the market value of the capital stock would become a controlling factor in fixing the value of the property. . . . The market value of the capital stock, it is urged, has no necessary relation to the value of the tangible property of the corporation. But such is the well-understood relation between the two, that not only is the value of the capital stock an essential factor in fixing the market value of the corporate plant, but the corporate capital or property has a reflex action on the value of the capital stock. . . . If, by reason of the good will of the concern, or the skill, experience and energy with which its business is conducted, the market value of the capital stock is largely increased, whereby the value of the tangible property of the corporation, *considered as an entire plant,* acquires a greater market value than it otherwise would have had, *it cannot properly be said not to be its true value in money* within the meaning of the Constitution, because good will and other elements indirectly entered into its value. . . . We discover no satisfactory reason why the same rule should not apply to the valuation of corporate property — why the selling value of the capital stock, as affected by the good will of the business, should be excluded from the consideration of the board of appraisers and assessors under the Nichols law;

charged with the valuation of corporate property in this State, especially as the capital stock when paid up practically represents, at least, an equal value of the corporate property."

Now, this language is susceptible only of one meaning, that is, that in assessing the actual intrinsic value of tangible property of express companies in the State of Ohio it was the duty of the assessing board to add to such value a proportionate estimate of the capital stock, so as thereby to assess not only the tangible property within the State, but also along with such property a part of the entire capital stock of the corporation, without reference to its domicil, and equally without reference to the situation of the property and assets owned by the company from which alone its capital stock derives value. In other words, although actual property situated in States other than Ohio may not be assessed in that State, yet that it may take all the value of the property in other States and add such portion thereof, as it sees fit, to the assessment in Ohio, and that this process of taxation of property in other States, in violation of the Constitution, becomes legal provided only it is called taxation of property within the State.

I submit that great principles of government rest upon solid foundations of truth and justice, and are not to be set at naught and evaded by the mere confusion of words. In considering a question of taxation in Postal Telegraph Cable Co. v. Adams, 155 U. S. 688, to which case I shall hereafter refer, this court said (p. 698): "The substance and not the shadow determine the validity of the exercise of the power." It seems to me that to maintain the tax levied by the State of Ohio this ruling must be reversed, and the doctrine be announced that the shadow is of more consequence than the substance. Such result would appear to inevitably flow from the holding referred to, now affirmed by the court. Nothing, I submit, can be plainer than the fact that the value of the capital stock of a corporation represents all its property, franchises, good will — indeed, everything owned by it wherever situated. I reiterate, therefore, that the rule which recognizes that for the purpose of assessing tangible property in one State you may take its full worth and then add to the value

of such property a proportion of the total capital stock, is a rule whereby it is announced that the sum of all the property, or an arbitrary part thereof, situated in other States, may be joined to the valuation of property in one State for the purpose of increasing the taxation within that State. What difference can there be between an actual assessment by Ohio of property situated in New York, Pennsylvania, Massachusetts or in any of the other States of the Union, and the taking by Ohio of an aliquot part of the value of all the property situated in such other States and adding it, for the purpose of assessment, to the value of property in Ohio? The recognition of this method breaks down both of the well-settled and elementary rules to which I have in the outset adverted.

*First, the rule which forbids one State to extend its power of taxation beyond its jurisdiction to property in another State.* If the express companies are domiciled in New York, and have millions of property there situated and subject to taxation, all of which give value to their capital stock and hence enter into the sum of its worth, how can it be that to tax a proportion of the value of all that property is not taxing the property itself? This proportion of the capital stock added to the inherent value of the property in the State of Ohio is, therefore, an actual taxation by the State of Ohio of property situated in the State of New York.

It seems to me that not only the illegality but the injustice of this taxation by the State of Ohio on these express companies which is now upheld, is clear. Let me suppose that the bonds, stocks, other investments and elements, which representing the capital of the companies, and therefore producing the resultant value of such capital stock, are situated in the States of New York, Pennsylvania and Massachusetts. These items thus making up the value of the capital stock being so situated in such States are, of course, entirely and wholly at their full value assessable in those States. The attribution of an aliquot share of the value of the capital stock to the State of Ohio, and the consequent right of that State to tax such value, in no way deprives the States of New York, Pennsylvania and Massachusetts of their right to assess

the property within their borders for its full value. But as attributing to the State of Ohio a proportion of such property gives that State the right to tax the proportion allotted, it follows by an inevitable deduction that the recognition of the right here claimed practically subjects the property in the States of New York, Pennsylvania and Massachusetts to double taxation, unless those States voluntarily forego the inherent power of taxation vested in them to levy a tax upon all the property within their respective jurisdictions. Certainly the States of New York, Massachusetts and Pennsylvania would, if they were independent sovereignties, removed from the jurisdiction of the Constitution of the United States, be driven to protect, by retaliatory legislation, their citizens, as was the case between the States prior to the adoption of the Constitution. But having entered into the Union, these States are bereft of all such relief, and must thus look for the protection of their citizens to the remedies afforded by the Constitution itself. The rule now announced allows Ohio to exercise an authority in violation of the Constitution, and thereby strips not only the citizens of the other States but those States themselves of all redress by depriving them of the safeguards which it was the avowed purpose of the Constitution to secure.

. Second, as to the interstate commerce clause. It is clear that the recognition of a right to take an aliquot proportion of the value of property in one State and add it to the intrinsic value of property in another State and there assess it, is in substance an absolute denial and overthrow of all the great principles announced from the beginning, and enforced by the many decisions of this court, on the subject of interstate commerce. This results from the fact that the necessary consequence of the ruling in this case is this, that a corporation — and there is no distinction, in principle in the particular here considered, between a corporation and an individual — cannot go from one State into another State of the Union for the purpose of there engaging in interstate commerce business without subjecting itself to the certainty of having a proportion of all its property situated in the other States added to the sum of property,

however small, which it may carry into the State to which it goes, for the purposes of taxation therein. Under this system, not only is an appalling penalty imposed for going from one State into another State, but the carrying on of interstate commerce itself becomes hampered and loaded with a burden threatening its absolute destruction.

The contradiction involved in the proposition is well illustrated by the legislation and decisions of the State of Ohio. Thus, as I have said, in addition to the tax imposed on express companies, which is here considered, the law of the State of Ohio, besides assessing their real estate, also imposes a tax on the gross receipts of such companies for business done within the State. In order to save the tax here in question, the law by which this last tax is imposed is careful to provide that nothing in the imposition of the tax therein provided, that is, the tax on gross receipts, shall be construed as impairing the right to the tax on tangible property already provided for (the tax here in question). Now, in passing upon the validity of this tax on gross receipts, the Supreme Court of Ohio treats it as not a double tax, because the previous tax is considered as one on tangible property. *Adams Exp. Co.* v. *Ohio*, 44 Northeastern Rep. 506. We have, therefore, both the legislature and the court of last resort of the State of Ohio upholding the enormous valuation put upon the personal property for the purposes of the tax now before us, on the theory that such valuation includes an aliquot part of the capital stock and necessarily, therefore, also an equal portion of all the property and earnings of the company, both in and out of the State, and yet we have the same legislature and the same tribunal upholding the tax on gross receipts on the ground that the tax first provided is purely a tax upon tangible property. Thus the departure from the pathway of principle is marked in this instance, as it is always marked, by confusion and injustice.

The wound which the ruling announced, if I correctly apprehend it, inflicts on the Constitution, is equally as severe upon the unquestioned rights of the States as it is upon the lawful authority of the United States, because whilst submit-

ting the States and their citizens to injustice and wrong committed by another State, it at the same time greatly weakens. or destroys the efficacy of the interstate commerce clause of the Constitution.

But the contention is that however sound, as an original question, may be the reasoning upon which the tax is assailed, its validity is not now open to question, because the theory by which the State of Ohio added the value of property outside of the State to the intrinsic amount of property actually within the State for the purposes of taxation is asserted to be concluded by many adjudications of this court. The cases relied on to establish this proposition are cited in the opinion of the court. I submit that the statement made by this court in *Pacific Express Company* v. *Seibert*, 142 U. S. 339, is a sufficient answer to this contention as regards all the cases relied on decided prior to that case. The *Seibert case* involved the question of the validity of a law of the State of Missouri imposing a tax upon the gross receipts of an express company in addition to the ordinary tax upon its tangible property. The court, finding the tax to be only on the business of the company within the State, held it not to be a tax on interstate commerce, and therefore valid. The court, through Mr. Justice Lamar, in speaking of the right of a State to classify express companies for the purpose of taxation, resulting from the fact that such companies were normally only owners of a small amount of tangible property in one State, said (p. 354):

"On the other hand, express companies, such as are defined by this act, have no tangible property, of any consequence, subject to taxation under the general laws. There is, therefore, no way by which they can be taxed at all unless by a tax upon their receipts for business transacted. This distinction clearly places express companies defined by this act in a separate class from companies owning their own means of transportation."

The argument here advanced in favor of the tax, therefore, simply is that what this court said could not be done in a decision rendered in January, 1892, had theretofore been settled to the contrary by a line of adjudications. But the answer to

the contention in favor of the tax does not rest alone upon this view.  All the cases relied upon and referred to in argument were considered and interpreted in *Postal Telegraph Cable Co.* v. *Adams,* 155 U. S. 688.  It becomes unnecessary, therefore, to review the prior cases in detail and analyze their reasoning, since this duty was effectually performed by this court in the opinion announced in the *Postal Telegraph case.* The significance of the ruling in that case and the controlling nature of the principles which the opinion there rendered inculcated can better be understood by considering the controversy which that case determined, and the aspect in which it was necessarily presented to this court for adjudication.  The case involved the validity of a tax imposed by the State of Mississippi on a telegraph company.  The tax in the mere form of its imposition was undoubtedly on the occupation and business of the company, and, therefore, was an unlawful burden on interstate commerce, as the company was engaged in such commerce.  The controversy came to this court on error from the Supreme Court of the State of Mississippi.  The attention of that court, in determining the issue presented to it, was called to all the previous decisions of this court.  Considering these previous adjudications, the Mississippi court said that there was undoubtedly language in opinions of this court which seemed to support the validity of the tax there questioned, and there was also undoubtedly language in other lines of adjudication which seemed clearly to render the tax void under the Constitution of the United States.  In view of the apparent conflict in the cases decided by this court, the Mississippi court, in its opinion, marshalled the authorities upon both sides, and expressed its hesitancy and diffidence in reaching a conclusion.  The *Postal Telegraph case,* therefore, pointedly called the attention of this court to all the previous cases and accentuated the arguments on both sides of the issue presented, and rendered it absolutely necessary for this court to construe and interpret all the previous adjudications.  In this condition of things, in deciding the case and holding the tax valid, although in form a tax upon interstate commerce, this court said (p. 695):

"It is settled that where by way of duties laid on the transportation of the subjects of interstate commerce, or on the receipts derived therefrom, or on the occupation or business of carrying it on, a tax is levied by a State on interstate commerce, such taxation amounts to a regulation of such commerce and cannot be sustained. But property in a State belonging to a corporation, whether foreign or domestic, engaged in foreign or interstate commerce, may be taxed, or a tax may be imposed on the corporation on account of its property within a State, and may take the form of a tax for the privilege of exercising its franchises within the State, if the ascertainment of the amount is made dependent in fact on the value of its property situated within the State (the exaction, therefore, not being susceptible of exceeding the sum which might be leviable directly thereon), and if payment be not made a condition precedent to the right to carry on the business, but its enforcement left to the ordinary means devised for the collection of taxes. The corporation is thus made to bear its proper proportion of the burdens of the government under whose protection it conducts its operations, while interstate commerce is not in itself subjected to restraint or impediment."

And again (p. 696):

"Doubtless, no State could add to the taxation of property according to the rule of ordinary property taxation, the burden of a license or other tax on the privilege of using, constructing or operating an instrumentality of interstate or international commerce, or for the carrying on of such commerce; but the value of property results from the use to which it is put, and varies with the profitableness of that use, and by whatever name the exaction may be called, if it amounts to no more than the ordinary tax upon property or a just equivalent therefor, ascertained by reference thereto, it is not open to attack as inconsistent with the Constitution. *Cleveland, Cincinnati &c. Railway* v. *Backus*, 154 U. S. 439, 445."

Referring to the opinion of the Supreme Court of Mississippi, which directly involved all the issues presented by this case, the court said (p. 697):

"And in the case at bar the Supreme Court, in its examination of the liability of plaintiff in error for the taxes in question, said: 'It will be thus seen at once that this is a tax imposed upon a telegraph company, in lieu of all others, as a privilege tax, and its amount is graduated according to the amount and value of the property measured by miles. It is to be noticed that it is in lieu of all other taxes, state, county and municipal. The reasonableness of the imposition appears in the record, as shown by the second count of the declaration and its exhibits, whereby the appellant seems to be burdened in this way with a tax much less than that which would be produced if its property had been subjected to a single *ad valorem* tax.' This exposition of the statute brings it within the rule where *ad valorem* taxes are compounded or commuted for a just equivalent, determined by reference to the amount and value of the property. Being thus brought within the rule, the tax becomes substantially a mere tax on property and not one imposed on the privilege of doing interstate business. The substance and not the shadow determines the validity of the exercise of the power."

And summing the whole up, the court concluded (p. 700):

"We are of opinion that it was within the power of the State to levy a charge upon this company in the form of a franchise tax, but arrived at with reference to the value of its property within the State and in lieu of all other taxes, and that the exercise of that power by this statute, as expounded by the highest judicial tribunal of the State in the language we have quoted, did not amount to a regulation of interstate commerce or put an unconstitutional restraint thereon."

This construction of the previous cases decided by this court elucidates and makes plain the fact that they proceeded upon and were intended to enforce the rule that the validity of a state tax would be determined by the substantial results of the burden imposed, and not by the mere form which it assumed, and although the form of the imposition might seem to bring the tax within the reach of the inhibition against levying a charge upon property beyond the jurisdiction of the State, or within the prohibitions of the Constitution of the United States

forbidding the laying of burdens on interstate commerce, this court would not interfere therewith provided the exaction in substance amounted to no more than the sum of the taxation which the State might lawfully impose upon the property actually within its jurisdiction, and provided that in reality the burden laid by the State was not an interference with interstate commerce. This explanation and this rule were the answer given to the question directly presented as to the significance and interpretation of the previous decisions now cited as authority for the proposition that it is within the power of a State not only to tax at will property beyond its jurisdiction, but also to substantially destroy interstate commerce by heaping direct and onerous burdens thereon. Such explanation and ruling were also reiterated in the recent decision in *Western Union Telegraph Co.* v. *Taggart*, 163 U. S. 1, where, at page 18, it is clearly intimated that a taxing law could not be upheld which in its necessary operation was shown to be oppressive and unconstitutional.

Testing the tax in controversy by the rule laid down in the *Postal Telegraph case*, it becomes in reason impossible to conclude otherwise than that it is both in form and substance taxation by the State of Ohio of property beyond its jurisdiction, and that it also is an imposition by that State of a burden on interstate commerce. It cannot with fairness be argued that the amount of the tax is only such sum as would have resulted from a levy upon the property actually in the State, when the record admits that the aggregate value of such property for the taxing years of 1893, 1894 and 1895 amounted only to two hundred and odd thousand dollars, while the assessment exceeds this amount by nearly four millions of dollars. It cannot be said that this vast excess does not embrace property situated outside of Ohio, when both the text of the statute of that State and such text as expounded by the Supreme Court of the State clearly show that the sum of the excess is arrived at by adding to the property in the State the value of property situated outside thereof. Nor can it be contended that the tax here involved is not a tax on interstate commerce, in view of the fact that, from the nature of the criteria of value adopted,

an aliquot part of the avails and receipts of the company of every kind is added to the taxing value in the State of Ohio, although that State had also imposed a tax upon the gross receipts from business of a purely state nature.

But, dismissing absolutely from consideration the authoritative construction of all the prior decisions of this court, announced in *Postal Telegraph Company* v. *Adams*, and conceding for the sake of argument that the previous adjudications now relied on are unexplained by that case, and that they substantially hold that there is a so-called unit rule properly applicable to the assessment for taxation of the continuous lines of telegraph and railroad companies, such concession does not in reason admit the validity of the method adopted by the State of Ohio for assessing the tangible personal property of express companies. Before proceeding to discuss this proposition, however, I call attention to the fact that I intentionally refrain from placing a sleeping car company in the same category with telegraph and railroad companies, because the decision in the case of the *Pullman's Car Co.* v. *Pennsylvania*, 141 U. S. 18, was not founded upon the theory, nor did it purport to assert that the property or plant of a sleeping car company was a unit, and that of necessity a part of such property may be measured by a rule applicable to continuous lines of road. In that decision the court merely emphasized the holding that the tax was one laid upon one hundred cars of the company, possessing an actual situs in Pennsylvania. In the statement of the case (p. 20) the decision of the Supreme Court of Pennsylvania was quoted verbatim, in which it was declared that the tax on the capital stock of the Pullman company was in reality but a tax on its property; that the coaches of the company were such property, and that the fact that the coaches might also be operated in other States would simply reduce the value of the property in Pennsylvania justly subject to taxation there. This court practically adopted the views so expressed by the state court. When, however, it was said (p. 26) that the method of assessment, to wit, taking a proportion of the capital stock ascertained on the mileage basis, as the value of one hundred sleeping cars

was a just and equitable method, such statement was made with reference to the facts held to exist in the case before the court. What were those facts? The taxes demanded covered a period of eleven years, and, excluding interest from the time when payable and the attorney general's commission for collecting, aggregated but $16,321.89.  107 Penn. St. 156, 158. Surely, this court might well say that a rule of taxation which operated to assess on one hundred sleeping cars a tax of less than $1500 per annum was, in the absence of any showing to the contrary, just and equitable to the company.  No such showing was made.  The objection advanced by counsel to the method of taxation was, not that the results produced were inequitable, but that (theoretically, not practically) the method adopted was improper.  Indeed, the facts of that case caused the ruling there made to be but an example of the principle subsequently explicitly announced in *Postal Telegraph Company* v. *Adams, ubi supra.*

It is, I submit, undeniable that if there be such a unit rule applicable to the continuous lines of telegraph and railroad companies, its existence pushes the power of state taxation, as to these particular kinds of property, at least to the confines of the Constitution, and therefore if under the rule of *stare decisis* the cases which announce it should be followed, they should not be extended.  The mere ownership, however, by an express company of personal property within a State presents no case for the application of a unit rule.  What unity can there be between the horses and wagons of an express company in Ohio with those belonging to the same company situated in the State of New York?  The conception of the unity of railroad and telegraph lines is necessarily predicated upon the physical connection of such property.  To apply a rule based upon this condition to the isolated ownership by an express company of movable property in many States, in reality declares that a mere metaphysical or intellectual relation between property situated in one State and property found in another creates as between such property a close relation for the purpose of taxation.  But this theory by an enormous stride at once advances the unit rule beyond every

constitutional barrier, and causes such rule or theory to embrace property between which there is and cannot in the nature of things be any real union or relation whatever. If mere intellectual union between property be thus adopted, as a rule of taxation, then all the restrictions upon the power of a State to tax property arising from the fact that the situs of such property is beyond its jurisdiction, as well as of the restraints arising from the interstate commerce clause of the Constitution, are destroyed. Certainly, the mere fact that the same owner has movable property in one State and movable property in another State, does not from the fact of the one ownership create a link of continuity between the property for the purpose of taxation. The fact that if the movable property situated in one State earns profits, and the movable property in the other likewise so earns, and that these profits go to the common owner, does not create such unity for the purpose of taxation so as to make the property assessable in each State. This court has effectually determined that where a corporation is engaged in interstate business, no one of the States has the power to tax the receipts of such company derived from interstate commerce business, and that the power of the States as to taxation on earnings is limited to those derived from the business done within the State. This line of concluded authority is illustrated and referred to in the recent opinion in *Osborne* v. *Florida,* 164 U. S. 650, decided at this term. It is, therefore, manifest that where property owned in common, belonging to the same person and situated in different States, contributes to earnings, and the proceeds of these earnings go into the treasury of the owner, and lie side by side therein, that the fact that there is a common owner, that there is a common business, and that all the results of the business are in immediate contact in the common treasury, gives no power to the State to tax the whole, but only to levy on that which comes from the state business alone. How, I submit, can it now be announced that there is an imaginary unity between personal property widely separated because that property has a common owner, without, at the same time, reversing the settled

.adjudications of this court on the subject of the power of a State to tax the earnings from interstate commerce?

But a few illustrations will serve at once to make clear what I submit is the impossibility in reason of declaring that as a legal fact or fiction property is unified, when between such property there is no unity or physical relation whatever.

Take, for example, the case of *Brennan* v. *Titusville, supra.* Of what value is the ruling in that case, that a manufacturer cannot be compelled to pay a license for the doing, through his agent, of the business of interstate commerce by selling his goods in a State into which such agent enters for that purpose, if the mere fact that the agent takes into the State a thousand dollars worth of goods, creates a supposed intellectual union between those goods and the vast stock and capital of the manufacturer located in another State, so as to enable the attribution of an aliquot part of the wealth of the manufacturer to the goods in the custody of the agent for the purpose of taxation? Would it not be as true in such case to say that the capital and wealth of the manufacturer facilitates and increases the capacity of the agent to transact business and adds value to the property the agent has for sale, as to say that the horses and wagons of an express company in New York and its capital there facilitate and aid the agents of such company and add value to the tangible property employed by such agents in transacting business in Ohio? It certainly cannot, I submit, with reason be said that there is not the same unity between the operations of a manufacturer who makes his goods in one State and sells them in another as there is between the operations of an express company. The sale of the manufactured goods is as essentially necessary to the profits of the manufacturer as is the manufacture of the goods themselves. No profit can result from the one without the other, and to attribute a supposed unity to the business of an express company, and to deny such unity to that of a manufacturer, is, as I understand it, to declare that there is a difference when there is no possible difference.

If the rule contended for by the State of Ohio be true, why would it not apply to a corporation, partnership or individual

engaged in the dry goods business or any other business having branches in various States? Would it not be as proper to say of such agencies, as it is of the agencies of express companies, that there is an intellectual unity of earnings between the main establishment and all such agencies, and therefore a right to assess goods found in an agency with relation to the capital and wealth of the original house and all the other branches situated in other States? Take the case of a merchant carrying on a general commercial business in one State and having connections of confidence and credit with another merchant of great capital in another State. If this rule be true, can it not also be said that such merchant derives advantages in his business from the sum of the capital in other States which may be availed of to extend his credit and his capacity to do business, and that therefore his tangible property must be valued accordingly? Suppose bankers in Boston, Philadelphia and New York of great wealth, owning stocks and bonds of various kinds, send representatives to New Orleans with a limited sum of money there to commence business. These representatives rent offices and buy office furniture. Is it not absolutely certain that the business of those individuals would be largely out of proportion to the actual capital possessed by them, because of the fact that reflexly and indirectly their business and credit is supported by the home offices? In this situation, the assessor comes for their tax return. He finds noted thereon only a limited sum of money and the value of the office furniture. What is to prevent that official under the rule of supposed metaphysical or intellectual unity between property from saying: "It is true you have but a small tangible capital, and your office furniture is only worth $250, but the value of property is in its use, and as you have various elements of wealth situated in the cities named, I will assess your property because of its use at a million dollars"? Such conduct would be exactly in accord with the power of taxation which it is here claimed the State of Ohio possesses, and which, as I understand it, the court now upholds. To give the illustrations, I submit, is to point to the confusion, injustice and impossibility of such a rule.

Nor, in conclusion, I submit is there any force in the argument advanced at bar that we have entered a new era requiring new and progressive adjudications, and that unless this court admits the power of the State of Ohio to tax to be as claimed, it will enable aggregations of capital to escape just taxation by the several States. This assertion, at best, but suggests that unless constitutional safeguards be overthrown, harm will come and wrong will be done. In its last analysis the claim is but a protestation that our institutions are a failure, that time has proven that the Constitution should not have been adopted, and that this court should now recognize that fact and shape its adjudications accordingly. The claim is as unsound as the fictitious assertion of expediency by which it is sought to be supported. If it be true that by the present enforcement of the Constitution and laws property will escape taxation, the remedy must come not from violating the Constitution but from upholding it.

Within the power lodged in Congress to regulate commerce between the States ample authority exists to enact the necessary legislation to prevent the just relations between the States, and the regulation of such commerce from becoming the pretext for avoiding the proper burdens of either State or national taxation. As the necessity arises such apt powers will doubtless be brought into operation. The recognition of the right of taxation exerted by the State of Ohio in these cases must, if followed in other States, not only reproduce the illegality and injustice here shown, but greatly increase it, as every new imposition will be a new levy on property already taxed, and result in an additional burden on interstate commerce. If the principles by which such results are brought about be recognized as lawful under the Constitution, not only will Congress be deprived of all power to protect the citizens of the respective States and the States themselves from these conditions, but it will also be rendered impotent to devise under the power to regulate commerce any just and fair regulation to prevent the interstate commerce clause from being made a shield for avoiding taxation and to cause property engaged in such commerce to be subjected to just and

uniform taxation on the part of the several States. Thus, by holding that the States possess the power claimed in this case to exist, not only will a wrong be committed, but that wrong will be permanently and without remedy engrafted into our constitutional system.

I am authorized to say that MR. JUSTICE FIELD, MR. JUSTICE HARLAN and MR. JUSTICE BROWN concur in this dissent.